## UNITED STATED DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE
## CASE NO. 3:12-CV-273-DJH

**PAUL F. MIK, JR. et al.**

**PLAINTIFFS**

**v.**

**FEDERAL HOME LOAN MORTGAGE**           **DEFENDANT**
**CORPORATION**

## RESPONSE TO DEFENDANT FEDERAL HOME LOAN
## MORTAGE CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiffs, Paul F. Mik, Jr., Lee Ann Mik, and PALS Enterprises LLC,

(collectively the "Miks" or "Plaintiffs"), and for their Response to Defendant Federal Home

Loan Mortage Corporation's ("Freddie Mac") Motion for Summary Judgment state as follows:

## OVERVIEW

"Bona fide" residential tenants are provided protections after foreclosures under the

*Protecting Tenants at Foreclosure Act of 2009*, Publ. L. No. 111-22, §702, 123 Stat. 1632, 1661

(codified at 12 U.S.C. § 5220 note (Supp. V. 2012) (hereinafter "PTFA"). Under the PTFA, no

bona fide tenant may be evicted by unless provided notice and 90 days. *Id.* at § 702. In

situations where the foreclosing owner does not intend to reside in the home, bona fide tenants

operating under written leases are explicitly permitted to stay until the end of their term. *Id.*

Under the PTFA, a lease or tenancy "shall be considered bona fide" if: "(1) the mortgagor or the

child, spouse, or parent of the mortgagor is not the tenant; (2) the lease or tenancy was the result

1

of an arms-length transaction; and (3) the lease or tenancy requires the receipt of rent that is not substantially less than fair market rent for the property. . . ."

Here, the Miks satisfy all the criteria entitling them to the tenant protections under the PTFA. They were not relatives of the mortgagor, Wanda Riley, the written lease was a lease (as a matter of law), it was negotiated in good faith by non-affiliated, unrelated parties and reviewed by counsel, and Freddie Mac makes no argument that the agreed $1000 per month was less than the fair market rental price for the property. *See Affidavit of Paul Mik,* ¶¶ 12-17, attached hereto as Exhibit "A". Genuine issues of material fact persist, and Freddie Mac is not even close to being entitled to summary judgment.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment may only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In reviewing a motion for summary judgment, the court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir.2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

## LEGAL ARGUMENT

### A. Plaintiffs were Bona Fide Tenants under the PTFA

1. **The Lease Agreement was a Lease with Option to Purchase as Matter of Law**

Despite openly admitting that Plaintiffs entered into a "LEASE WITH OPTION TO BUY" agreement (hereinafter the "Lease") with the former property owner, Wanda Meyer, Freddie Mac completely ignores the plain terms of the Lease and the legal implication of those words. Without any discussion of the actual Lease itself, Freddie Mac tenuously insists that, because the Plaintiffs' actions expressed an intention to exercise a future purchase option, the Lease was actually a sale, which, in turn, would allow Freddie Mac to avoid its foreclosure obligations to bona fide tenants under the FTLA. Freddie Mac's convoluted argument is both legally and factually incorrect.

Even a cursory review of the Lease reveals the fatal flaws in Freddie Mac's argument. *Lease* attached hereto as Exhibit "B". Paragraphs 1 & 2 of the Lease set a leasehold term of twenty four (24) months at the rental rate of $1,000 per month. *Id.* Other terms common in residential leases (e.g. lessee responsible for maintenance less ordinary wear and tear, quiet enjoyment, etc.) are contained in Paragraphs 3-5. *Id.* Paragraph 6 pertains to the Plaintiff's option and is explicitly labeled "Option to Purchase". *Id.* Paragraph 6 states that Plaintiffs have 24 months to exercise their exclusive option to buy the property for $180,000. *Id.* It was agreed "that if the Lessee exercises their right to purchase said property, the Parties shall execute a Contract for Deed" or other suitable financing arrangement. *Id.* The Option paragraph further states that if "lessee does not exercise his exclusive option to purchase at expiration of the twenty-four month period, the lease shall terminate." *Id.*

Under existing Kentucky law as established through hundreds, if not thousands of cases, an unambiguous contract must be construed according to its terms, and extrinsic evidence concerning the parties' intent cannot be considered. *See 3D Enterprises Contracting Corp. v.*

3

*Louisville and Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). As

stated by the Kentucky Supreme Court:

> "An agreement to settle legal claims is essentially a
> contract subject to the rules of contract interpretation." *Cantrell
> Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384
> (Ky.App.2002). The primary objective is to effectuate the
> intentions of the parties. Id. When no ambiguity exists in the
> contract, we look only as far as the four corners of the document to
> determine the parties' intentions. *Hoheimer v. Hoheimer*, 30
> S.W.3d 176, 178 (Ky.2000). **"The fact that one party may have
> intended different results, however, is insufficient to construe a
> contract at variance with its plain and unambiguous terms**."
> *Cantrell*, 94 S.W.3d at 385. "Generally, the interpretation of a
> contract, including determining whether a contract is ambiguous, is
> a question of law for the courts and is subject to de novo review."
> Id.

*3D Enterprises,* 174 S.W.3d at 448 (emphasis added). It is presumably undisputed that the

present Lease agreement was a contract, and the Court is obliged to enforce it according to its

plain and unambiguous terms.

Here, the four corners of the Lease agreement clearly and plainly demonstrate that it is a

simple residential tenancy lease with an attached purchase option that remains open for two (2)

years. Per the *3D Enterprises* case and many others, the mere fact that Paul Mik may have

"intended different results" by making improvements with the intent to later purchase the

property does not change its legal nature or magically convert the Miks from tenants into

purchasers.

From a practical standpoint, Freddie Mac's argument (e.g. the legal nature of a contract is

not determined by its plain terms, but rather through what the parties may have intended), if

accepted, would effectively stand Kentucky real property law on its head. Suppose, for example,

the Miks discovered environmental wastes under the home which would cost $5 million to

4

remediate. Could Wanda Meyer have forced the sale on the Miks simply because they made improvements (as tenants) with the landlord's blessing despite never actually exercising the option? Or could the Miks be able to simply decide to not buy the property, as they are permitted under existing Kentucky precedent? The answer is easy.

The lone Kentucky case cited by Freddie Mac, *Trinity Temple Charities, Inc. v. Louisville,* 188 S.W.2d 91 (Ky. 1945) in support of its position is a tax case and is completely inapposite. In the *Trinity Temple* case, Trinity Temple sought to avoid paying taxes on certain real property it purported to have leased from a third-party church (which ostensibly was exempt from taxation). In rejecting Trinity Temple's position and finding that the purported lease with purchase option instead constituted an installment sales contract subject to taxes, the Kentucky Supreme Court (then the Court of Appeals) noted, *inter alia*, that that the total rent for the term of the so-called lease equaled the purchase price of the property, the payment of rent reduced the purchase price on a dollar-for-dollar basis, and the real estate brokers were paid their sales commissions. *Id.* at pp. 93-94. Moreover, the court expressly stated that its holding did not govern the relationship between the parties and was limited to the question of whether taxes were owed: "**Regardless of the rights of the parties as between themselves**, we are only concerned here with the question of intention as it bears upon the right to subject the property to taxation." *Id.* at 94 (emphasis added).

None of the factors present in the *Trinity Temple* case are present here. The Court need not look any further than the fact that the monthly $1,000 rent was wholly independent from and had no relationship to the $180,000 option purchase price and that the Miks made no payments towards the purchase of the home to determine that the *Trinity Temple* case does not advance Freddie Mac's argument.

However, a similar factual situation presented itself in the case of *Cawthon v. McAlister*, 290 S.W. 316 (Ky. 1927). In *Cawthorn*, the contract agreement gave the lessee the option to purchase the property for $692 at the end of the 52 week lease term so long as the lessee complied with the terms of the lease, including payment of the $4 per week rent. *Id.* at 316. After the lessee was apparently evicted for nonpayment of rent and the contract cancelled by the lessor/owner, the lessee brought suit making the exact same arguments that Freddie Mac makes here: that the parties intended this to be a sales contract and not a lease contract with an option to purchase. *Id.* In rejecting this argument, the Kentucky Supreme Court ruled:

> Appellant insists that the name given by the parties to the instrument is not controlling, and that it is in effect a contract of sale, by which he acquired an interest in the property, and that the only way he can be dispossessed is through an action by appellee to enforce his lien. **It is true that the nature of a contract depends, not on its name, but on its terms, but, when its terms conform to its name, there is no room for dispute. The contract in question not only purports to be "a lease with option to purchase," but its provisions are not susceptible of any other construction.**

*Id.* (emphasis added). There can be no other interpretation of the lease/option agreement entered into by the Miks and Wanda Meyer.

Under Kentucky law, there is absolutely no question that, at all relevant times, the Miks were tenants with the option to purchase the property. The most compelling evidence of the reality that the option remained open and unexercised at the time of the foreclosure is the simple fact that the Miks never made any payment – not a plugged nickel – towards the $180,000 option price. *See* Mik Affidavit, ¶ 21. Ergo, the unpublished Texas PTFA action brought by a pro se litigant, *Martinez-Bey v. Bank of America*, 2013 WL 3054000 (N.D. Tex. 2013) is equally unpersuasive.

6

In *Martinez-Bey,* the pro se plaintiff sought damages under the PTFA for wrongful eviction. Notably, the plaintiff specifically alleged that he was in the middle of "purchasing the Property under a contract" with the debtor and insisted that he should be given the opportunity to "be able to buy the [Property], as [he had] been doing." *Id.* at p. *4. Not surprisingly, the District Court rejected his PTFA claim on the basis that he not a bona fide tenant under the PTFA, "because he agreed to purchase the property before the foreclosure sale and was allegedly deprived of the opportunity to complete the purchase, or dispute or modify the debt on the Property." *Id.*

Here, in contrast, the Miks have never claimed that they exercised their option and purchased the property from Wanda Meyer, and in fact, they actually represented to the Bank's attorneys that they were lease tenants at the foreclosure sale. Paul Mik 9/8/14 Dep. at p. 180.

Even beyond the fact that the Miks never made any payments Freddie Mac offers zero evidence that the Miks ever exercised the option. There is no written confirmation of the exercise of the option; no contract for deed (or other instrument) was ever drafted or adopted by the parties; and there was no financing or payment of any of the $180,000 purchase price. *See* Affidavit, ¶ 21. In fact, the Miks never even attempted to obtain the financing that would allow them to buy the home until several months after the foreclosure. *Id.* at ¶ 21. It is also important to note, as mentioned *supra.*, that the Lease stipulated that monthly rent was completely independent from and unrelated to the purchase price (e.g. past rental payments would not be deducted from the purchase price). This demonstrates that a written understanding by the parties that the lease and the option/purchase were completely separate legal creatures.

In summary, the Court should find that the contract at issue was a lease agreement with an option to purchase, as a matter of law. In addition, not only do genuine issues of material fact exist regarding the Mik's status as "bon fide tenants" under the PTFA, literally *ALL* of the evidence presented points to the conclusion that no reasonable juror could ever find that the Miks were not bona fide tenants. Freddie Mac's Motion for Summary Judgment should be denied.

## 2. The Miks never Violated the Lease

Freddie Mac also offers the interesting but completely untrue and fabricated argument that the the Mik's improvements to the homestead violated the Lease provisions. Freddie Mac says that the improvements violated the Lease and constituted an immediate default that effectively terminated the lease, and that the act of improving the property further bolsters Freddie Mac's contention that the Lease was actually a sale (despite the Lease's plain language). There are several problems with Freddie Mac's argument.

First, the improvements did not violate the Lease between Meyer and the Miks, and Freddie Mac offers only conjecture, no facts, in support of its contention. In contrast to Freddie Mac's unsupported claim that the $22,000 in improvements somehow violated the Lease, the exact opposite is actually true. Wanda Meyer not only knew about the Mik's work on the house, she actually gave the Miks her blessing to make whatever improvements they desired. *See* Paul Mik Aff., ¶ 18. To this end, the Miks even hired Wanda Meyer's son to perform some of the work, such as painting, hanging doors and performing odd jobs. *Id.*, ¶ 19.

Moreover, Freddie Mac offers no factual proof and only its unsupported argument that the parties to the Lease ever considered any improvements to be a violation or default. In reality, the truth of the matter is that the Mik's improvements inured to Wanda Meyer's (and ultimately

8

Freddie Mac's) benefit, because they never exercised their option prior to the foreclosure sale. It is well-established in Kentucky that a tenant cannot recover the value of any improvements he/she makes to a property unless expressly provided for in the lease contract. *See Kessler v. Grasser*, 187 S.W.2d 1012, 1012-1013 (Ky. 1945) ("a tenant cannot recover of his landlord the value of improvements and repairs except in accordance with an express contract to that effect."). Here, because the Miks never exercised the purchase option, the value of their improvements went with the property when sold at foreclosure. Ergo, the Bank and Freddie Mac enjoyed the free fruits of the Mik's efforts.

Moreover, as stated in the cases cited *supra.,* improvements and intentions do not change the plain terms of a signed agreement or the parties' status. Consequently, the improvements also do nothing to help Freddie Mac's "it was a sale, not a lease" argument.

### 3. "The Boy who Cried Wolf" – The Mik's Purported Nonpayment of Rent, which was caused by Freddie Mac, did not extinguish their tenant rights under the FTPA

Freddie Mac further contends that the purported nonpayment of the $1000/month rent following the foreclosure sale constituted an automatic default and termination of the lease and/or resulted in Plaintiffs "not paying fair market rent" (Freddie Mac Brief, p. 13-14), disqualifying Plaintiffs from "bona fide tenant" status under the PTFA. This argument demonstrates a fundamental misunderstanding of Kentucky's Uniform Residential Landlord Tenant Act, KRS 383.505-705 and constitutes a classic case of "boy who cried wolf" syndrome.

Paul Mik's testimony established that the Miks attempted to determine where and how the Miks should pay future rent with the foreclosing bank, Citimortgage, Inc. (the "Bank"), but

the Bank and its attorneys either simply ignored those requests or opted to not provide them with that information.

According to Paul Mik, the Miks were current on their $1000/month rental payments through April 2011 when they learned of the foreclosure sale, and there had been no deliquency. Mik 9/8/14 Dep. at pp. 174-177. The facts are very much different from the unpublished Ohio case cited by Freddie Mac, *DLJ Mortg. Capital, Inc. v. Rosario,* 2014 WL 1775970, *2 (Ohio App. 2014), wherein the tenants had no written lease and admitted that they paid no rent.

After learning of the foreclosure sale in early April 2011, Paul went to the sale, introduced himself to counsel for Citimortgage, Inc., Derrick Staton (whose name was incorrectly captured by the court reporter in the deposition as "Eric Stanton"), told Mr. Staton that he was living in the home pursuant to a lease with Wanda Meyer, and inquired as to where the Miks needed to send the future rent checks. Mik 9/8/14 Dep. at pp. 174-177. Mr. Staton would not provide an answer to Paul's question. *Id.* at pp. 175-176.

Subsequently, on April 26, 2011, Paul wrote a certified letter to Mr. Staton, requesting that he "guide [the Miks] in the necessary steps in making contact with the bank." *Id.* at p. 176. Paul further stated in the letter that the Miks desired to purchase the home from the Bank. Neither the Bank nor Mr. Staton ever responded to this letter. Paul Mik 9/8/14 Dep. at p. 176.

Although it is unknown why the Bank and its attorney refused to provide information to Paul, including the routing for future rent checks, one logical explanation is that the Bank and its attorneys feared simply did not want to accept a rent check from a putative tenant on a foreclosed property out of fear it might create a landlord-tenant relationship. Regardless, the Bank cannot complain about the nonpayment of rent after refusing to provide appropriate information.

10

The Bank also argues that the lack of rent payments created a default situation which triggered the default clause in the lease, thereby terminating Lease terms and giving Freddie Mac the power to "reenter and repossess the leased premises, either with or without process of law, and expel the Lessee, agents and employees claiming under said Lessee and remove their effects from said premises." *See* Lease, ¶ 5 . First of all, neither Ms. Meyer, nor the Bank ever held the Miks in default and/or terminated the lease, and Freddie Mac cannot retroactively and selectively claim to have done so now, some four (4) years after the lease has already ended. Paul Mik Affidavit, ¶ 20.

More importantly, the automatic eviction/termination provision contained in the lease cited by Freddie Mac to justify the wrongful eviction of Plaintiffs is quite clearly unenforceable as a matter of law under Kentucky's Residential Landlord-Tenant Act (hereinafter "LL-TT Act"), KRS 383.505, *et. seq.* No residential lease agreement in Kentucky can require a tenant to "waive or forgo rights or remedies" available under the LL-TT Act. KRS 383.570. KRS 383.660(2) provides: "If a rent is unpaid when due and the tenant fails to pay rent within seven (7) days after written notice by the landlord of nonpayment and his intention to terminate rental agreement if the rent is not paid within that period, the landlord may terminate the rental agreement."

Thus, under explicit Kentucky law, tenants, such as the Miks, must be allowed at least seven (7) days after written notice to cure any delinquency in the rent payments, and to the extent that the Lease and the Freddie Mac state otherwise, they lose. In this case, it is undisputed that neither Wanda Meyer nor Freddie Mac ever gave the Miks any kind of written notice concerning their supposed nonpayment of rent, let alone a 7 day notice. Paul Mik Aff., ¶ 21. Consequently, Freddie Mac's argument fails.

11

## 4. The Lease Agreeement was an Arms-Length Transaction

Freddie Mac also mentions that the Lease was not an arms-length transaction, because Paul Mik "took advantage of an opportunity he gained in a fiduciary capacity". This is untrue. Paul Mik was not Wanda Meyer's fiduciary. Paul Mik Aff. ¶ 10. Her attorney came to Mr. Mik, who holds an auctioneer's license, to see whether he could auction off her property to pay off her mortgage. Paul Mik Aff. ¶¶ 3-10. Paul Mik determined that he would be unable to sell the property at auction, and consequently, Mrs. Meyer never hired Paul to sell her property. *Id.* It was only after he had declined to participate in an auction of her land when he made the "flip" comment that his wife might like the property did the parties delve into the possibility of the Miks purchasing her home and/or lots. *Id.* at ¶ 11. Even then, the Miks would not agree to purchase the home outright for the price Mrs. Meyer proposed. *Id.* at ¶ 11. Specifically, she wanted the Miks to pay the amount necessary to pay off the mortgage debt, but the Miks knew the house was not worth close to that figure. *Id.* at ¶ 12. This disagreement was what led to the parties entering into the Lease with a purchase option which was ultimately reviewed by Mrs. Meyer's attorney. *Id.* at ¶ 12-16.

Even putting aside Freddie Mac's complete lack of evidence to support its inference that the transaction was not "at arm's length", Paul Mik's affidavit and deposition testimony clearly create genuine issues of material fact on this issue. At bottom, this Court cannot find that the lease at issue was not the result of an arm's length transaction as a matter of law, and Freddie Mac's motion should be denied.

12

5. **The "Cash for Keys" Agreement Violates the PTFA**

Ironically, the "Cash for Keys" Agreement (hereinafter "CFK") cited by Freddie Mac will be the central focus of the Mik's proof when this matter goes to trial, because it perfectly demonstrates the strong-arm, foreclosure tactics that the PTFA was designed to prevent.

To wit, Freddie Mac refused to honor the Mik's 2 year lease, never provided any notice to vacate, and never initiated a forcible detainer eviction action against the Miks as required by Kentucky law. Paul Mik Affidavit, ¶ 22. Instead, on June 15, 2011, Freddie Mac obtained a "Writ and Order of Possession" (hereinafter the "Writ", attached hereto as Exhibit "") commanding Wanda Meyer to vacate and put Freddie Mac in possession of the premises. The Writ did not name the Miks, despite Freddie Mac's knowledge of their tenancy, and it was never served on the Miks. Aff. at ¶ 22.

On the afternoon of June 15, 2011 or June 16, 2011, the local Meade County Sheriff Dan McCubbins left a business card at the residence. Paul Mik Aff. at ¶ 24. The Miks called Sheriff McCubbins to inquire about the card, and the Sheriff informed that Miks that he had a Writ requiring the Miks to vacate the premises by the following "Monday" (June 20, 2011) or be forcibly evicted. *Id.* at ¶ 25. Sheriff McCubbins was informed that the Miks had not been served with any Writs, but the Sheriff was not persuaded by that fact. *Id.* at ¶ 26. Thus, the Miks learned on Wednesday, June 15, 2011 that they and their two (2) children were being forcibly evicted from their home in less than a week on Monday, June 20, 2011.

Knowing that they only had a few days before they would be left homeless, the Miks and their then-attorney contacted the attorneys (Lerner, Sampson & Rothfuss) that obtained the Writ on Freddie Mac's behalf. *Id.* at ¶ 27. The Miks were routed to an individual at the Lerner firm

13

named Joe Mai. *Id.* at ¶ 28. Mr. Mai held himself out to the Miks and their counsel as an attorney with Lerner, Sampson & Rothfuss, and it was only later that they discovered that Mr. Mai was a paralegal not an attorney. *Id.* at ¶ 28, 32.

When the Miks explained to Mr. Mai that there must be some mistake, because the Miks were living in the house under a written rental agreement and that they had never received any notice to vacate, Mr. Mai told the Miks that the only way Freddie Mac and his office would not evict them on Monday, June 25, 2011 would be if the Miks agreed to sign the "Cash for Keys" deal, which ostensibly would let them remain as tenants through July 25, 2011. Paul Mik Aff., ¶ 29. It was only after Freddie Mac (through Joe Mai) threatened to illegally leave the Miks homeless in a matter of days did the Miks agree to sign the CFK deal, which was signed on June 20, 2011, the very day that Sheriff McCubbins had promised to evict them from their home. They would not have done so, otherwise. *Id.* at ¶ 29. Later, during the course of this litigation, an attorney for Lerner advised the Miks that Mr. Mai was "no longer with the firm." *Id.* at ¶ 32.

Further, the Miks never completed the paperwork to finalize the CFK deal, never received any payment from Freddie Mac, and informed Freddie Mac that they would not leave their home. *Id.* at ¶ 31.

In Kentucky, an agreement foisted upon an aggrieved party under economic duress is unenforceable. "Duress is where one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of his free will." *Fears v. United Loan & Deposit Bank*, 189 S.W. 226, 232 (Ky.1916). Here, Freddie Mac was obligated to comply with the tenant protections afforded by the PTFA. It breached its statutory obligations by obtaining a Writ and threatening to illegally evict the Miks and their two

14

minor children with hardly any notice. Reasonable jurors could conclude that the Miks were forced into the CFK agreement under duress, and Freddie Mac's motion should be denied.

## The Miks did not Release their Claims Against Freddie Mac

Freddie Mac next argues that the Miks "released [their] claims against Defendant when they re-acquired the Property [from Freddie Mac] at a substantial discount". *See Freddie Mac Brief*, p. 7. Freddie Mac points to paragraph 13 of the Addendum to the Purchase Contract for this proposition. Either Freddie Mac fundamentally misreads that provision, or it resorts to the frivolous and wastes the parties' and this Court's time. The Indemnity provision states:

> 13. INDEMNIFICATION: Purchaser agrees to indemnify Seller and full protect, defend and hold Seller, its tenants, agents, employees and contractors, harmless from and against any and all claims, costs, liens, loss, damages, attorney's fees and expenses of every kind and nature that may be sustained against Seller or any damage to the Property of any adjoining property, or any injury to Purchaser or any other persons that may result or arise out of inspections made by Purchaser or its agents, employees and contractors prior to closing.

By its express terms, this indemnification provision applies to claims against the Seller (i.e. Freddie Mac) "that may result or arise out of inspections made by Purchaser [the Miks]. . . ." No other interpretation makes sense. The FTPA claim made by the Miks against Freddie Mac did not result from or arise out of any "inspections" by the Miks when they purchased the property from Freddie Mac. Consequently, this indemnification language is completely irrelevant to the present action. Even assuming *arguendo* that this provision is ambiguous, which it is not, and somehow could be construed in the manner suggested by Freddie Mac, Freddie Mac presents no factual evidence to prove that was what was it intended. Accordingly, a genuine issue of material fact exists, and Freddie Mac cannot prevail as a matter of law.

15

WHEREFORE, the Plaintiffs respectfully request that this honorable Court deny Freddie

Mac's Motion for Summary Judgment, enter judgment in the Plaintiffs' favor and award them

their costs, fees and expenses.


Respectfully Submitted:


/s/ B. Ballard Rogers
B. Ballard Rogers
BALLAD ROGERS LAW OFFICE, PLLC
539 W. Market St., Suite 300
Louisville, Kentucky 40202
Ph:  (502) 640-3535
Fax: (502) 582-2296
ballard@ballardrogerslaw.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing Response was served by

upon the following on this 5th day of October, 2015 by Electronic filing.


Rick D. DeBlasis (KBA #92846)
LERNER, SAMPSON & ROTHFUSS
120 East Fourth Street, Suite 800
Cincinnati, Ohio 45202
Phone: (513) 412-6614
Fax: (513) 354-6765
E-mail: rdd@lsrlaw.com
*Counsel for Defendant, Federal Home Loan Mortgage Corporation*

/s/ B. Ballard Rogers
B. Ballard Rogers
Counsel for Plaintiffs


16