UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PAUL F. MIK, JR., et al.,                                        Plaintiffs,

v.                                           Civil Action No. 3:12-cv-273-DJH

FEDERAL HOME LOAN MORTGAGE
CORPORATION,                                                     Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiffs Paul Mik, Lee Ann Mik, and PALS Enterprises entered into a lease agreement with Wanda Meyer, that included an option to purchase the residence.  (Docket No. 49, PageID # 826–28)  While the Miks were living in the home, Meyer defaulted on her mortgage, and Defendant Federal Home Loan Mortgage Corporation (Freddie Mac) acquired the property.  (*Id.*) After obtaining a writ of possession for the property, Freddie Mac had the county sheriff remove the Miks' property from the residence.  (*Id.*, PageID # 829–30)  Plaintiffs filed suit against Freddie Mac, alleging that it violated the Protecting Tenants at Foreclosure Act of 2009 (PTFA) and wrongfully evicted them.  (D.N. 1)  In response, Freddie Mac filed a motion to dismiss (D.N. 6), which the Court granted, finding that the PTFA did not provide a private right of action. (D.N. 14)  On appeal, the Sixth Circuit affirmed in part, reversed in part, and remanded, holding that the plaintiffs' claim of unlawful eviction should have survived the motion to dismiss.  (D.N. 16)  Freddie Mac now moves for summary judgment.  (D.N. 49)  Because there are genuine disputes of material fact, the motion for summary judgment will be denied.

## I.    BACKGROUND

Wanda Meyer owned a home and four lots surrounding the home.  (D.N. 49, PageID # 826)  Meyer could no longer afford the mortgage payments for the properties and contacted a

1

lawyer who reached out to Paul Mik, a local real estate broker and auctioneer.  (*Id*., PageID # 827)  Mik claims that he informed Meyer that, while he could not sell the home for a price that would allow her to retire the mortgage, he and his family would be interested in a lease-option. (*Id*.)  Paul Mik and his wife Lee Ann Mik own and operate PALS Enterprises, LLC (PALS). (D.N. 1, PageID # 2)  On October 15, 2010, "PALS, through its member, Paul Mik," entered into a lease-option agreement with Meyer.  (*Id*., PageID # 828)  The contract provided for PALS to lease the property in exchange for $1,000 per month in rent, and PALS had an option to purchase the property for $180,000 within two years.  (*Id*.)  On the same day that the parties entered into the lease agreement, PALS and Meyer also executed a deed of conveyance, transferring the four lots surrounding the property to PALS "for the price of $12,000."  (*Id*.)

Before moving into the home, the Miks made several improvements, including "replac[ing] doors, carpeting, the refrigerator, and ceramic tiles; . . . remov[ing] a wall and install[ing] columns in the entry foyer."  (*Id*.)  Freddie Mac alleges that "these alterations were made to the home despite a provision in the Lease-Option prohibiting alterations."  (*Id*.)  Several months after the Miks moved into the home, Meyer defaulted on her mortgage.  (*Id*., PageID # 828–29)

The Sixth Circuit provided the following summary of the somewhat convoluted string of events following Meyer's foreclosure based on the Miks' complaint:

> Meyer defaulted on her mortgage, and her lender, CITI Mortgage, Inc., initiated foreclosure proceedings. The Miks were not named as parties in the foreclosure action either by name or as "unknown tenant(s) or occupant(s)." CITI Mortgage was the successful bidder at the foreclosure sale on April 20, 2011, and it assigned its bid to Freddie Mac. The Miks recorded their lease—which they concede was initially unrecorded—on April 12, 2011, but they did not notify CITI Mortgage of the existence of their lease until April 28, 2011. The Miks paid rent on April 1, 2011, but they claim that they did not pay rent thereafter because they did not know to whom rent should be paid.

2

In June 2011, the Miks contacted Joe Mai, a paralegal at the law firm that represented Freddie Mac. They told him that they had a lease with an option to purchase Meyer's residence and that they desired to remain in the home. Mai told the Miks that they could avoid eviction and stay in the residence until July 25, 2011 if they participated in a relocation assistance program called Cash for Keys, whereby they would be paid $1,500 to vacate the residence. The Miks signed the agreement, but they were not paid $1,500 and did not vacate the residence. The Miks were told to contact Freddie Mac's agent Sherry Bennett Webb, who would arrange for the property to be inspected before the Miks were paid. In July 2011, Paul Mik contacted Webb and informed her that he had a lease with an option to purchase the residence.

On June 15, 2011, Freddie Mac obtained a writ of possession for the property. The writ stated that Meyer was to be evicted from the premises, but it did not mention the Miks. On July 27, 2011, the Miks were informed that they could buy the property for $190,000 and avoid being evicted if they could demonstrate that they qualified for a loan by 5 p.m. on Friday, July 29, 2011. On July 28, 2011, deputies from the Meade County Sheriff's Department arrived at the residence with a copy of the writ of possession. Lee Ann Mik explained that Meyer did not live on the property and that the Miks had not been served with legal documents concerning the eviction. The deputy said that he would return on Monday to lock the Miks out of the residence.

The Miks contacted Mai, who reiterated that the Miks could avoid eviction only by showing that they were approved for a $190,000 home loan by 5 p.m. that Friday. The Miks applied for a loan, and the bank notified Mai that the Miks had submitted an application but that it would take about two weeks to have the property appraised. On July 31, 2011, Webb informed the Miks that they would be evicted the following day. Paul Mik again told Webb that he had a lease and that he had not been served with any court documents.

On August 8, 2011, Paul Mik posted a copy of the lease on the door of the residence with a note stating: "We are asserting our rights under this lease and object to entry by anyone." That day, deputies from the Meade County Sheriff's Department "set out" the Miks' property, removing it from the residence and placing it in the yard. More than $38,000 of property was damaged or destroyed by rain. In November 2011, the Miks obtained the loan for which they had applied and purchased the property from Freddie Mac.

In May 2012, the Miks filed suit against Freddie Mac in federal district court. The complaint alleged that Freddie Mac "disregarded [Section 702] of the Protecting Tenants at Foreclosure Act of 2009." The Miks claimed that they

> relied on the provisions of the Protecting Tenants at Foreclosure
> Act of 2009 to be able to continue to reside in their home until
> they were given the notice to vacate required in the statute and

3

until the expiration of the remaining term of the lease as prescribed in the statute, during which time the [Miks] anticipated that their loan application would be approved and they would be able to purchase the subject property from [Freddie Mac].

Next, the complaint alleged that the Miks "were wrongfully evicted when [Freddie Mac] failed to follow due process prior to evicting the [Miks] from their home." More specifically, it alleged that Freddie Mac evicted the Miks without naming them as parties to the foreclosure action or bringing a forcible detainer action against them. Finally, the complaint alleged that Freddie Mac's actions "were outrageous and inflicted severe emotional distress upon the [Miks]." Paul Mik claimed that he "has suffered mental anguish" and Lee Ann Mik stated that she "has experienced severe emotional pain and suffering for which she has been provided medical treatment."

Freddie Mac filed a motion to dismiss the Miks' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Miks' claims are premised on the PTFA, which does not create a private right of action. The district court granted Freddie Mac's motion to dismiss. First, it held that the Miks cannot state a claim under the PTFA, which does not provide an express or implied private right of action. It observed that while the PTFA may be raised as a defense in a foreclosure action in state court, it does not provide a basis for recovering damages in federal court. Second, the district court held that "a reading of the Complaint makes it clear that [the Miks] have asserted only causes of actions under the Act and not under state law." Moreover, it noted that a foreclosure sale extinguishes the rights of tenants under Kentucky law and, therefore, tenants must raise a defense of due process or unfair conduct during foreclosure proceedings, which the Miks did not do.

*Mik v. Fed. Home Loan Mortgage Corp.*, 743 F.3d 149, 154–56 (6th Cir. 2014). In *Mik*,

the Sixth Circuit affirmed in part, reversed in part, and remanded, holding that

the PTFA does not provide a private right of action. Nonetheless, the PTFA requires successors in interest to foreclosed properties to provide *bona fide* tenants with 90 days' notice to vacate and to allow them to occupy the premises until the end of their lease term unless certain conditions are met. The PTFA's requirements preempt state laws that provide less protection to tenants. While tenants may not bring a federal cause of action for violations of the PTFA, they may use such violations to establish the elements of a state law cause of action. We hold that the Miks have stated a claim for wrongful eviction but have failed to state claims for denial of due process and outrageous infliction of emotional distress.

*Id.* at 154.   Therefore, only the Miks' claim for wrongful eviction based on violations of the PTFA survives.

Freddie Mac has now filed a motion for summary judgment.   (D.N. 49)   Freddie Mac asserts that (1) Plaintiffs are not entitled to PTFA protection because they were not bona fide tenants; (2) even if they were bona fide tenants, they waived all claims against Freddie Mac by entering into the "Cash for Keys" agreement; and (3) in the alternative, the Miks settled and released all claims against Freddie Mac when they purchased the property from Freddie Mac after the eviction.   (*Id.*)   Plaintiffs refute these assertions and claim that (1) they were bona fide tenants under the PTFA, (2) they were under duress when they entered the "Cash for Keys" agreement and the agreement violates the PTFA, and (3) they did not release their claims against Freddie Mac when they purchased the property.   (D.N. 57)

The Court heard argument on Freddie Mac's motion for summary judgment.   (D.N. 61) Following the hearing, the parties submitted supplemental briefing.   (*Id.*; D.N. 64; D.N. 65)

## II.   DISCUSSION

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of identifying the basis for its motion and those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party satisfies this burden, the non-moving party must point to specific facts demonstrating a genuine issue of fact.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In considering a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party.   *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986).  However, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  The non-moving party must present specific facts demonstrating that a genuine issue of fact exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

> ### A.     Bona Fide Tenancy

Freddie Mac claims that the Miks were not bona fide tenants under the PTFA and therefore were not entitled to 90 days' notice to vacate the property.  (D.N. 49, PageID # 831–37)  The PTFA provides the following definition of bona fide tenancy:

> (b) BONA FIDE LEASE OR TENANCY.--For purposes of this section, a lease or tenancy shall be considered bona fide only if—
>
> > (1) the mortgagor or the child, spouse, or parent of the mortgagor under the contract is not the tenant;
> >
> > (2) the lease or tenancy was the result of an arms-length transaction; and
> >
> > (3) the lease or tenancy requires the receipt of rent that is not substantially less than fair market rent for the property or the unit's rent is reduced or subsidized due to a Federal, State, or local subsidy.

Pub. L. No. 111-22 § 702, 123 Stat. 1632, 1661.

> ### 1.     Whether Plaintiffs Were Tenants

Freddie Mac begins by arguing that the Miks cannot assert any claims against Freddie Mac because the Miks were not parties to the lease-option agreement.  (D.N. 49, PageID # 831–32)  Freddie Mac explains that the lease-option agreement was between Meyer and PALS, not the Miks, and there was no contract between the Miks and PALS or the Miks and Meyer.  (*Id.*)  According to Freddie Mac, Paul Mik "set up PALS as a separate corporation to gain certain

economic and legal advantages" and "never treated the arrangement as a tenancy or leasehold." (D.N. 64, PageID # 926)  Therefore, "without an actual lease agreement, the Miks cannot qualify as bona fide tenants, which defeats their claim under the PTFA."  (D.N. 59, PageID # 898–99)

In response, the Miks contend that they entered into a valid lease agreement with Meyer. (D.N. 57, PageID # 872–73)  They assert that Meyer knew that they would be residing in the home, and they point out that the lease refers to the lessee as "PALS Enterprises, LLC, by and through Paul Mik, Member/Manager."  (*Id.*, PageID # 873–76; D.N. 59, PageID # 898)  In addition, the contract contained terms common to residential lease agreements, such as specifying a rental rate.  (D.N. 57, PageID # 873)  Plaintiffs contend that "for all practical purposes," the Miks and PALs "were one and the same."  (D.N. 65, PageID # 933)

Additionally, the Miks argue that even if "it makes some difference that the Miks did not personally sign the lease with Wanda Meyer," it is a distinction without a difference.  (*Id.*)  The Miks contend that they were either "assignees of the written PALS lease by virtue of them personally assuming all responsibilities, or the Miks were, at the very least, subtenants of PALS that became month to month tenants by operation of law under KRS 383.656(3)."  (*Id.*) Regardless, the plaintiffs maintain that they were tenants of the residence "under Kentucky law and entitled to the protections of the PTFA."  (*Id.*)

### 2.  Whether Plaintiffs Were Mortgagors

Freddie Mac next argues that the Miks were simultaneously tenants and mortgagors and thus fail the first prong of the PTFA's bona fide tenancy requirements.  (D.N. 49, PageID # 832–33)  For support, Freddie Mac cites *Martinez-Bey v. Bank of America, N.A.*, No. 3:12-cv-4986-G-BH, 2011 U.S. Dist. LEXIS 85440 (N.D. Tx. May 22, 2013), in which the plaintiff claimed that he signed a six-month contract to purchase the property he had been leasing and was in the

process of purchasing the residence when it was foreclosed upon.  *Id*. at 11.  The plaintiff argued that he was not notified of the foreclosure and had been illegally evicted, but still wanted to buy the property "as he had been doing prior to the foreclosure."  *Id*. (internal quotation marks omitted).  The Court held that the plaintiff "was not a 'bona fide' tenant under the PTFA because he agreed to purchase the Property before the foreclosure sale and was allegedly deprived of the opportunity to complete the purchase, or dispute or modify the debt on the Property."  *Id*.  Thus, he was essentially acting as both mortgagor and tenant, and the "PTFA defines 'bona fide lease or tenancy,' in relevant part, as one where 'the tenant is not the mortgagor or the mortgagor's spouse, parent, or child.'"  *Id*. (citing Pub. L. No. 111-22, § 703(1), 2009, 123 Stat. 1632, 1661).  Freddie Mac argues that the Miks, like the plaintiff in *Martinez-Bey*, were both residing in and attempting to buy the property at the time of the foreclosure; therefore, they were not bona fide tenants under the PTFA.  (D.N. 49, PageID # 832–33)

The Miks argue that *Martinez-Bey* and other cases cited by Freddie Mac are inapposite because the Miks' "monthly $1,000 rent was wholly independent from and had no relationship to the $180,000 option purchase price," and "the Miks made no payments towards the purchase of the home."  (D.N. 57, PageID # 876)  Because they were not in the process of purchasing the home when the property was foreclosed, the Miks maintain they were tenants, not mortgagors. (*Id*. (citing *Cawthorn v. McAlister*, 290 S.W. 316 (Ky. 1927))

As further support for their argument that the Miks were mortgagors, Freddie Mac claims that Meyer "intended only to sell" the residence and, despite the contract being called "Lease with Option to Buy," the true purpose of the contract was to sell the property to the Miks.  (D.N. 49, PageID # 833)  Freddie Mac asserts that it was only after Paul Mik advised Meyer that the house would not sell for an adequate price on the market that Meyer agreed to the lease-option

arrangement. (*Id.*) Additionally, during his deposition Mik described the contract in the following way: "[W]e drew up a sales contract, one we would lease-option the home and the grounds in it, and then we would cash her out the ground we could cash her out on." (*Id.*) In the same deposition, Mik later agreed that "it was a mortgage loan" and not a "pure rental agreement." (*Id.*, PageID # 834)

In response, the Miks maintain that they were tenants, not mortgagors, because the lease-option contract was a lease agreement as a matter of law. (D.N. 57, PageID # 873) They point to the terms of the contract, which include "terms common in residential leases," such as "set[ting] a leasehold term of twenty four (24) months at the rental rate of $1,000 per month [and making the] lessee responsible for maintenance less ordinary wear and tear." (*Id.*) The Miks also emphasize Paragraph 6 of the contract, labeled "Option to Purchase," which provided that the plaintiffs would have twenty-four months to exercise their option, otherwise "the lease shall terminate." (*Id.*) If the Miks chose to exercise this right, then the parties would execute a separate Contract for Deed. (*Id.*) The Miks argue that these terms demonstrate that the contract was a lease agreement, not an attempt to purchase the home. (*Id.*)

Freddie Mac next points to the improvements that the Miks made to the home, including taking down a wall in the foyer, replacing the carpeting, and putting in a new refrigerator, as evidence of their intent to buy the property. (D.N. 49, PageID # 834–35) In addition, Freddie Mac claims the lease-option contract prohibited such alterations because it required the lessee to "return said premises to the Lessor in the same condition as when delivered to the Lessee." (*Id.*, PageID # 835) Therefore, Freddie Mac argues, they were acting more like purchasers than tenants.

While the Miks acknowledge that they "may have 'intended different results' by making improvements to the home with the intent to later purchase the property," they argue that these improvements do not change the "legal nature" of the contract "or magically convert the Miks from tenants into purchasers." (D.N. 57, PageID # 874)  Instead, the Miks claim that "the four corners of the Lease agreement clearly and plainly demonstrate that it is a simple residential tenancy lease with an attached purchase option that remains open for two (2) years." (*Id.*)  In addition, the Miks dispute that they violated the lease by making such improvements. (*Id.*, PageID # 878)  The plaintiffs assert that Meyer knew about the improvements and "gave the Miks her blessing to make whatever improvements they desired." (*Id.*)  Finally, the Miks point out that they did not seek to recover the value of their improvements because a tenant cannot do so under Kentucky law; therefore, they were acting as tenants rather than as buyers or owners of the property. (*Id.*, PageID # 878–79)

### 3.  Arms-Length Transaction

Freddie Mac asserts that the Miks are not bona fide tenants because the lease agreement was not the result of an "arms-length transaction," in violation of the second requirement of the PTFA. (D.N. 49, PageID # 835–36)  Freddie Mac argues that Paul Mik "took advantage of an opportunity he had gained in a fiduciary capacity to acquire the property for his family on favorable terms." (*Id.*, PageID # 835)  Specifically, Freddie Mac contends,

> Plaintiffs acquired the Property from Wanda Meyer at the option price of $180,000.00, put $22,000.00 in improvements into the Property, and acquired the surrounding lots for $12,000.00, for a total investment of $214,000.00. Less than 10 months later, on August 5, 2011, in applying to a local bank for a loan to complete their purchase of the Property, the Miks listed the Property as an asset with a total value of $290,000.00 ($235,000.00 for the home and $55,000.00 for the lots). If the Property were worth anything close to the value the Miks represented to their bank, then Paul Mik could have carried out Wanda Meyer's original wishes to sell the Property outright and negotiated any "short sale" with Wanda Meyer's mortgage lender for her benefit, instead of his.

10

(*Id.*, PageID # 835–36)   Additionally, Freddie Mac argues that Alec Stone, the attorney who drafted the agreement, was conflicted because he represented both Meyer and the Miks in negotiating the agreement.  (D.N. 64, PageID # 924)

The plaintiffs argue that the lease was, in fact, the result of an "arms-length transaction." (D.N. 57, PageID # 882)  First, the plaintiffs dispute that Paul Mik was Meyer's fiduciary.  The Miks emphasize that Meyer's attorney, Alec Stone, approached Mik about auctioning the property to pay off Meyer's mortgage; however, Mik determined that he could not sell the property at auction for the desired price.  As a result, Mik maintains that Meyer never hired him to sell or auction her property; therefore, he argues that he was never her fiduciary.  (*Id.*) Instead, after he declined to auction the residence and lots, Mik claims that he made a "flip comment that his wife might like the property," which led to the parties discussing the "possibility of the Miks purchasing [Meyer's] home."  (*Id.*)  The plaintiffs claim that when they could not come to an agreement with Meyer about the price of the property, the parties decided to enter into the lease-option agreement, which was "ultimately reviewed by Mrs. Meyer's attorney."  (*Id.*)  Thus, they claim the lease-option contract was the result of an "arms-length transaction."  (*Id.*)

### 4.  Fair Market Rental Payments

Finally, Freddie Mac claims that the Miks did not make "fair market rental payments." Freddie Mac points to the fact that the Miks' last rental payment was on April 1, 2011, but the "set-out" occurred in August 2011; therefore, the Miks did not make "fair rental payments" for four months preceding their eviction.  (D.N. 49, PageID # 836)  Because the Miks missed these payments, Freddie Mac alleges that they were not bona fide tenants under the PTFA.  (*Id.*)

In response, the plaintiffs contend that they attempted to pay rent but Citimortgage and its attorneys "either simply ignored those requests or opted to not provide them with the information." (D.N. 57, PageID # 879–80)  Paul Mik claims that he went to the foreclosure sale and introduced himself to Derrick Staton, counsel for Citimortgage.  Mik asserts that he told Staton "that he was living in the home pursuant to a lease with Wanda Meyer, and inquired as to where the Miks needed to send the future rent checks." (*Id*., PageID # 880)  Mik alleges that Staton would not answer his question. (*Id*.)  Mik claims that he then wrote a certified letter to Staton stating his desire to purchase the home and asking for "the necessary steps in making contact with the bank," but received no response. (*Id*.)  Therefore, the Miks argue that Freddie Mac "cannot complain about the nonpayment of rent" because they attempted to pay but Staton and Citimortgage "refus[ed] to provide appropriate information." (*Id*.)

Alternatively, the Miks argue that the eviction provision in the lease is unenforceable under Kentucky's Residential Landlord-Tenant Act.  Specifically, the Miks contend that under the law, Freddie Mac, as landlord, must allow at least seven days after written notice for the plaintiffs to cure any delinquency in rental payments. (*Id*., PageID # 881)  The Miks claim that because neither Meyer nor Freddie Mac gave them written notice of nonpayment, Freddie Mac's argument that they did not make "fair market rental payments" fails. (*Id*.)

Each of the above disputes goes to whether the Miks meet the statutory requirements of bona fide tenancy, and each side points to specific facts to support their arguments.  The Court will not weigh this evidence.  *See Anderson*, 477 U.S. at 249.  Therefore, viewing the evidence in the light most favorable to the Miks, *see Matsushita*, 475 U.S. at 586, the Court concludes that they have met their burden of demonstrating a genuine dispute of material fact as to whether they are bona fide tenants under the PTFA.

12

B.       "Cash for Keys" Agreement

Freddie Mac next asserts that, even if the Miks are considered bona fide tenants, they waived all claims against Freddie Mac when they entered into the "Cash for Keys" agreement. (D.N. 49, PageID # 837)  The agreement provided that the Miks would be paid $1,500 if they voluntarily vacated the residence by July 25, 2011.  (*Id.*)  Freddie Mac argues that the Miks knowingly and voluntarily accepted the agreement because during the negotiations, "the Miks were represented by counsel" and were advised by counsel to accept the offer.  (D.N. 59, PageID # 904)  Freddie Mac argues that by entering into this agreement, the Miks "waived their rights under the PTFA."  (*Id.*)  Furthermore, when the Miks did not voluntarily leave the property, as required by the agreement, Freddie Mac claims that they properly obtained a writ of possession and had the plaintiffs removed.  (*Id.*)

The Miks counter that they were forced into signing the "Cash for Keys" agreement, but never received any money from Freddie Mac, and "informed Freddie Mac that they would not leave their home."  (D.N. 57, PageID # 884)  They specifically contend that on June 15, 2011, the local sheriff informed them that Freddie Mac had obtained a writ requiring them to vacate the property by June 20, 2011.  (*Id.*)  The Miks claim that they were never served with any writs and that June 15, 2011 was the first time they learned of the requirement to vacate.  (*Id.*)  In response, the Miks called the law firm of Lerner, Sampson & Rothfuss and spoke with Joe Mai, a paralegal at the firm.  (*Id.*, PageID # 883–84)  According to the Miks, Mai held himself out as an attorney and told the Miks that "the only way" for them to remain in the home past June 20, would be to sign a "Cash for Keys" agreement.  (*Id.*)  The Miks allege that the threat of homelessness constituted economic duress; therefore, the deal is unenforceable.  (*Id.*)

13

As further evidence that the agreement is unenforceable, the Miks claim that they "never completed the paperwork to finalize" the "Cash for Keys" agreement. (*Id*.) However, the Miks provide no further explanation as to what paperwork they failed to complete and the impact of that failure on the validity of the agreement. Additionally, at the hearing, counsel for Freddie Mac stated that the Miks had completed the paperwork. Plaintiffs' counsel did not respond to this specific point during the hearing.

The Miks argue that the "Cash for Keys" agreement is unenforceable under the PTFA and Kentucky law "because it perfectly demonstrates the strong-arm foreclosure tactics that the PTFA was designed to prevent." (D.N. 57, PageID # 883) The Miks assert that by forcing them to sign the agreement under duress, Freddie Mac failed to: (1) properly honor the Miks' two-year lease, (2) provide the necessary notice to vacate, (3) initiate a forcible detainer action, (4) obtain a writ that named the Miks, and (5) serve the writ on the Miks. According to the Miks, because these failures violate both the PTFA and Kentucky law but were allowed under the "Cash for Keys" agreement, the agreement is unenforceable. (*Id*.)

Finally, in their supplemental brief, the plaintiffs argue that the principles of equitable estoppel should bar enforcement of the "Cash for Keys" agreement. (D.N. 65, PageID # 933–35) The Miks contend that Joe Mai made a "demonstrably" false statement when he told the Miks that they would be evicted unless they signed the "Cash for Keys" agreement. (*Id*. at 934) The Miks further claim that Freddie Mac did not inform them of their rights under the PTFA and disregarded the statute. (*Id*.) Therefore, the Miks argue that Freddie Mac should be equitably estopped from enforcing the "Cash for Keys" agreement. (*Id*. at 935)

### 1. Duress

"'Duress is an actual or threatened violation or restraint on a man's person, contrary to law, to compel him to enter into a contract or to discharge one.'" *Publishers Press, Inc. v. Montage Media Corp.*, No. 3:10-CV-068-H, 2011 WL 4587568, at *2 (W.D. Ky. Sept. 30, 2011) (quoting *Bond State Bank v. Vaughn,* 44 S .W.2d 527, 528 (Ky. 1931)).   "'While [financial] [difficulties] may tend to make one more susceptible to duress, of themselves they are insufficient to constitute civil duress.'"  *Cory v. Leasure*, No. 1:15-CV-00001-GNS, 2015 WL 4354330, at *3 (W.D. Ky. July 15, 2015) (alteration in original) (quoting *Boatwright v. Walker,* 715 S.W.2d 237, 243 (Ky. App. 1986)).   "A plaintiff asserting a claim for economic duress, must show something more than a 'difficult bargaining position or the pressure of financial circumstance.'"  *PNC Bank, Nat. Ass'n v. Seminary Woods, LLC*, No. 3:13CV-297-CRS, 2015 WL 4068380, at *19 (W.D. Ky. July 2, 2015) (quoting *Resolution Trust Corp. v. Ruggiero,* 977 F.2d 309, 313 (7th Cir. 1992)).   "The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact."   *Crestmark Bank v. Electrolux Home Prod., Inc.*, 155 F. Supp. 3d 723, 744 (E.D. Mich. 2016); *see also Humana, Inc. v. Fairchild*, 603 S.W.2d 918, 921 (Ky. Ct. App. 1980) ("Whether duress was involved in the appellee's resignation was a question of fact to be determined by the jury.").

As described above, the plaintiffs' allegation of duress relates to Freddie Mac threatening to remove them from the residence in a matter of days if they did not sign the "Cash for Keys" agreement.  (D.N. 57, PageID # 883–84)  However, these conditions are not sufficient proof of duress.  While the plaintiffs have described a stressful financial position that made bargaining difficult, they have not alleged something more, such as a "threatened violation or restraint on

[their] person." *Publishers Press, Inc. v. Montage Media Corp.*, 2011 WL 4587568, at *2. Therefore, the plaintiffs' allegations do not constitute duress.

### 2.  Equitable Estoppel

Following the hearing on Freddie Mac's motion for summary judgement, the Court allowed each party to submit "a supplemental brief addressing the arguments made" at the hearing.  (D.N. 61)   The plaintiffs first raised their claim of equitable estoppel in the supplemental brief that they filed following the hearing.  (D.N. 65, PageID # 934)

"The Supplemental Brief is properly construed as a sur-reply. It is well-established that a party should not raise new arguments in a reply brief." *Vanriper v. Local 14, Int'l Union United Auto., Aerospace & Agr. Implement Workers of America*, No. 3:13CV2102, 2015 WL 45533, at *9 (N.D. Ohio Jan. 2, 2015) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)).   Supplemental briefs "'do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.'"  *Id.*  (quoting *Scottsdale Ins. Co.*, 513 F.3d at 553).   To consider arguments first raised by the plaintiffs in their supplemental briefs "would be 'manifestly unfair to [the defendants] who, under our rules, ha[d] no opportunity for a written response.'"  *Cox v. Glanz*, No. 11-CV-457-JED-FHM, 2014 WL 11531341, at *4 (N.D. Okla. Feb. 3, 2014) (quoting *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994)).

Because the plaintiffs did not raise their equitable estoppel argument until they filed their supplemental brief and the defendants did not have the opportunity to respond, the Court will decline to consider this argument.

### 3.   Waiver of Claims

The next question is whether the "Cash for Keys" agreement constituted a waiver of the plaintiffs' rights under the PTFA.   Questions of contract interpretation are questions of law reserved for the Court.   *VIBO Corp. v. Conway*, 669 F.3d 675, 688–89 (6th Cir. 2012); *Cincinnati Gas & Elec. Co. v. F.E.R.C.*, 724 F.2d 550, 554 (6th Cir. 1984); *Principal Life Ins. Co. v. Doctors Vision Ctr. I, PLLC*, No. 5:12-CV-00125-JHM, 2014 WL 6751201, at *5 (W.D. Ky. Dec. 1, 2014).   "Courts interpreting contracts must look to the language of the agreement to determine the parties' intent."   *VIBO Corp.*, 669 F.3d at 688–89.

Freddie Mac argues that the plaintiffs waived their rights "by agreeing to vacate the Property voluntarily for consideration" in the Cash for Keys agreement.   (D.N. 49, PageID # 837)   However, Freddie Mac does not point to specific language in the agreement that effected such a waiver.   (*Id.*)   Freddie Mac cites the Cash for Keys Checklist (D.N. 59, PageID # 904 (citing D.N. 48-11)), but the Checklist does not contain any language that would suggest a waiver of the plaintiffs' PTFA rights.   (D.N. 48-11)   Instead, the Checklist specifies what condition the property must be left in for the occupant to receive money under the "Cash for Keys" agreement.   (*Id.*)   Therefore, because the defendants have not met their burden of showing that the "Cash for Keys" agreement constituted a waiver of the plaintiffs' rights under the PTFA, the Court will deny the defendants' motion for summary judgment on these grounds.   *See Celotex*, 477 U.S. at 323.

### C.   Release of Claims

Finally, Freddie Mac asserts that even if the Miks were bona fide tenants and the "Cash for Keys" agreement did not effect a waiver of their PTFA rights, the Miks released all claims against Freddie Mac when they purchased the property from the defendant after their eviction.

(D.N. 49, PageID # 838)  Freddie Mac argues that the plaintiffs waived "all claims they may have had against Defendant at the time they signed the addendum" by agreeing to the following provision in the sales contract:

> 13.    <u>INDEMNIFICATION</u>        Purchaser agrees to indemnify Seller and fully protect, defend and hold Seller, its tenants, agents, employees and contractors, harmless from and against any and all claims, costs, liens, loss, damages, attorney's fees and expenses of every kind and nature that may be sustained against Seller or any damage to the Property of any adjoining property, or any injury to Purchaser or any other persons that may result or arise out of inspections made by Purchaser or its agents, employees and contractors prior to closing.

(*Id*.; D.N. 48-13, PageID # 664)  Freddie Mac claims that the plaintiffs' "wrongful eviction claim falls squarely within the scope of the indemnification provision," and thus, "Plaintiffs have expressly waived their right to pursue the present action."  (D.N. 49, PageID # 838)

In response, the plaintiffs argue that Freddie Mac misinterprets the indemnification provision.  (D.N. 57, PageId # 885)  The Miks contend that the provision should be read to apply to claims against Freddie Mac "that may result or arise out of inspections made by" the Miks. (*Id.*)  Because the Miks' PTFA claim does not "result from or arise out of inspections" made by the Miks, they argue that the provision does not apply and they did not release their claims. (*Id.*) Alternatively, they argue that even if the provision did apply in the way Freddie Mac suggests, "Freddie Mac presents no factual evidence to prove that was what [] it intended."  (*Id.*)

As with the "Cash for Keys" agreement, the Court must determine whether a contract between the parties constituted a waiver of the plaintiffs' rights under the PTFA.  Because this is a question of contract interpretation, the Court will "look to the language of the agreement to determine the parties' intent."  *VIBO Corp.*, 669 F.3d at 688–89; *Caudill Seed & Warehouse Co. v. Houston Cas. Co.*, 835 F. Supp. 2d 329, 332–33 (W.D. Ky. 2011) (quoting *Logan Fabricom, Inc. v. AOP P'ship LLP,* 2006 WL 3759412, *2 (Ky. Ct. App. December 22, 2006)).  If the Court

18

finds the contract to be clear and unambiguous, the contract "'will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.'"   *Caudill Seed & Warehouse Co.*, 835 F. Supp. 2d at 332–33 (quoting *Frear v. P.T.A. Indus., Inc.,* 103 S.W.3d 99, 106 (Ky. 2003)).   "'A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations.'" *Id.* (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)).

The Court concludes that the plain language and punctuation of the contract provision suggest that the indemnification only applies to inspection.   The provision is written as one continuous phrase that is separated by commas; therefore, the Court finds that the "inspections made by Purchaser . . ." modifies the entire preceding phrase.   (D.N. 48-13, PageID # 664)   Had a semi-colon, for example, separated the phrases, the Court could have concluded that there were two separate grounds for indemnification.   However, as it is written, the language and punctuation lead to the conclusion that the provision is a single phrase modified by the inspection clause at the end of the sentence.

While the plain language and punctuation alone is sufficient, the Court also notes that this clause appears to be part of a boilerplate purchase agreement.   Freddie Mac used almost identical language in a Sales Agreement between Freddie Mac and Dragone Realty LLC, which contained the following provision:

> 11.   <u>Inspection.</u> . . . Purchaser agrees to indemnify and hold Seller, its tenants, contractors, and employees, harmless from any and all liens, claims, suits, liabilities, costs, expenses, or damages sustained by or threatened against Seller or any of the foregoing which result from or arise out of any inspection by Purchaser or its authorized representatives . . . .

19

*Federal Home Loan Mortgage Corporation, et al. v. Robert E. Young, et al.*, 8:14-cv-3779, Compl. Ex. A (D. Md. December 3, 2014).   In the sales contract in *Young*, the language in question was contained in a paragraph labeled "Inspection," suggesting that this provision limits only claims that are related to the Purchaser's inspection of the property.  *Id*.  While the contract states that paragraph headings "are for convenience only and shall in no way enlarge or limit the scope or meaning of the paragraphs hereof," the remainder of the clause makes clear that the provision is addressing any "physical inspection of the Property."  *Id*.

Freddie Mac next maintains that the indemnification clause waives "all claims" that the plaintiffs may have had against Freddie Mac when they signed the contract.  (D.N. 49, PageID # 838)   However, reading the paragraph that broadly would require the clause to end after "sustained against Seller."  This reading ignores the limiting clauses contained in the second half of the paragraph.   Additionally, the four paragraphs preceding the clause in question address physical inspections, compliance certificates, termites and wood destroying insects, and repairs. (D.N. 48-13, PageID # 663–64)   While not determinative, the context of the surrounding provisions suggests that the provision is limited to claims "that may result or arise out of inspections."  (*Id*.)

Finally, even if the clause was ambiguous, any doubts would be resolved in favor of the Miks' reasonable expectations.  *See Caudill Seed*, 835 F. Supp. 2d at 332–33 (citing *Wolford v. Wolford,* 662 S.W.2d 835, 838 (Ky. 1984)).  For the reasons above, the Court finds that it was reasonable for the Miks to believe that the clause waived only claims that arose of an inspection of the property.

Therefore, the Court concludes that the plaintiffs did not waive their PTFA claims against Freddie Mac by agreeing to the indemnification clause.

III.     **CONCLUSION**

For the reasons explained above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows

(1)     Freddie Mac's motion for summary judgment (D.N. 49) is **DENIED**.

(2)     Pursuant to 28 U.S.C. 636(b)(1)(A), this matter is hereby referred to U.S. Magistrate Judge Dave Whalin, for resolution of all litigation planning issues, entry of scheduling orders, consideration of amendments thereto, and resolution of all non-dispositive matters, including discovery issues.  Judge Whalin is further authorized to conduct a settlement conference in this matter at any time.

March 6, 2017

**David J. Hale, Judge**
**United States District Court**

21